UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| APACHE CORPORATION, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-08-1064 |
| | § | |
| THE NEW YORK CITY EMPLOYEES' | § | |
| RETIREMENT SYSTEM, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court are plaintiff Apache Corporation's Original Complaint seeking a declaratory judgment (Dkt. 1) and application for a preliminary injunction (Dkt. 5.) The court combined the hearing on Apache's request for injunctive relief with trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. The court has carefully reviewed the application, all responsive and supplemental pleadings, declarations and other record evidence, arguments of counsel, and the applicable law. For the reasons discussed below, the court finds that Apache properly excluded defendants' proposal from proxy materials mailed to Apache's shareholders. Therefore, judgment will be entered in favor of Apache and against the defendants. As Apache has succeeded on the merits of its declaratory judgment action, the parties have agreed that the court need not address Apache's request for injunctive relief.

**BACKGROUND**

Apache is a Delaware corporation, with its principal office and principal place of business in Houston, Texas. Apache is an independent energy company that explores for, develops, and produces natural gas, crude oil, and natural gas liquids. Defendants New York City Employees' Retirement System, New York City Teachers' Retirement System, New York City Police Pension

Fund, New York City Fire Department Pension Fund, New York City Board of Education Retirement System (collectively, "Funds"), and Office of the Comptroller of the City of New York ("NYC Comptroller") are five New York pension funds and New York's chief fiscal and chief auditing officer, the custodian and trustee of the Funds.[1]  Each defendant's principal office and principal place of business are in New York City, New York.

On October 29, 2007, NYC Comptroller submitted to Apache, pursuant to Section 14(a) of the Securities Exchange Act of 1934,[2] a shareholder proposal ("Proposal") for inclusion in the company's proxy statement to be mailed in advance of Apache's May 8, 2008, annual shareholders' meeting.  The Proposal reads:

### SEXUAL ORIENTATION

**Submitted By William C. Thompson, Jr., Comptroller, City of New York, on behalf of the Boards of Trustees of the New York City Pension Funds**

> **WHEREAS**, corporations with non-discrimination policies relating to sexual orientation have a competitive advantage to recruit and retain employees from the widest talent pool;
>
> Employment discrimination on the basis of sexual orientation diminishes employee morale and productivity;
>
> The company has an interest in preventing discrimination and resolving complaints internally so as to avoid costly litigation and damage its reputation as an equal opportunity employer;
>
> Atlanta, Seattle, Los Angeles, and San Francisco have adopted legislation restricting business with companies that do not guaranteed equal treatment for lesbian and gay employees and similar legislation is pending in other jurisdictions;

---

[1]  The Office of the Comptroller of New York City is the custodian, but not the trustee, of the New York City Board of Education Retirement System.

[2]  Pursuant to its rulemaking authority, the Securities and Exchange Commission promulgated rules regulating the shareholder proposal submission process. *See* 17 C.F.R. § 240.14a–8.

The company has operations in and makes sales to institutions in states and cities which prohibit discrimination on the basis of sexual orientation;

A recent National Gay and Lesbian Taskforce study has found that 16% -44% of gay men and lesbians in twenty cities nationwide experienced workplace harassment or discrimination based on their sexual orientation;

National public opinion polls consistently find more than three-quarters of the American people support equal rights in the workplace for gay men, lesbians, and bisexuals;

A number of Fortune 500 corporations have implemented non-discrimination policies encompassing the following principles:

1) Discrimination based on sexual orientation and gender identity will be prohibited in the company's employment policy statement.
2) The company's non-discrimination policy will be distributed to all employees.
3) There shall be no discrimination based on any employee's actual or perceived health condition, status, or disability.
4) There shall be no discrimination in the allocation of employee benefits on the basis of sexual orientation or gender identity.
5) Sexual orientation and gender identity issues will be included in corporate employee diversity and sensitivity programs.
6) There shall be no discrimination in the recognition of employee groups based on sexual orientation or gender identity.
7) Corporate advertising policy will avoid the use of negative stereotypes based on sexual orientation or gender identity.
8) There shall be no discrimination in corporate advertising and marketing policy based on sexual orientation or gender identity.
9) There shall be no discrimination in the sale of goods and services based on sexual orientation or gender identity, and
10) There shall be no policy barring on corporate charitable contributions to groups and organizations based on sexual orientation.

**RESOLVED:** The Shareholders request that management implement equal employment opportunity policies based on the aforementioned principles prohibiting discrimination based on sexual orientation and gender identity.

> **STATEMENT:** By implementing policies prohibiting discrimination based on sexual orientation and gender identity, the Company will ensure a respectful and supportive atmosphere for all employees and enhance its competitive edge by joining the growing ranks of companies guaranteeing equal opportunity for all employees.

(Dkt. 6.) Apache refused to include the proposal in its proxy materials and on January 3, 2008, pursuant to Rule 14a–8(j), Apache requested a no-action letter from the Securities and Exchange Commission's ("SEC") Division of Corporation Finance. (Dkt. 28, Ex. 2.) Apache asserted that the Proposal relates to the company's ordinary business operations and, therefore, is properly excludable from the proxy materials pursuant to Rule 14a–8(i)(7). *Id.* Both Apache and defendants extensively briefed the SEC on their respective positions. (*Id.* at Exs. 3-6.) On March 5, 2008, the SEC's Division of Corporation Finance issued a no-action letter. The SEC found,

> The proposal requests that management implement equal employment opportunity polices [sic] based on principles specified in the proposal prohibiting discrimination based on sexual orientation and gender identity.
>
> There appears to be some basis for your view that Apache may exclude the proposal under rule 14a–8(i)(7). We note in particular that some of the principles relate to Apache's ordinary business operations. Accordingly, we will not recommend enforcement action to the Commission if Apache omits the proposal from its proxy materials in reliance on rule 14a–8(i)(7).

(*Id.* at Ex. 6) On March 31, 2008, Apache sent out notice of its annual meeting of stockholders and proxy statement. (*Id.* at Ex. 7.) The proxy statement did not include the Proposal. (*Id.*)

On April 8, 2008, Apache filed a declaratory judgment action in this court. (Dkt. 1.) Apache seeks a declaration that it properly excluded the Proposal pursuant to Rule 14a–8(i)(7). The next day, defendants filed a parallel lawsuit in the Southern District of New York. On April 10, 2008, Apache moved this court for a temporary restraining order. After a hearing, this court declined to issue a TRO. Instead, the court scheduled a hearing on Apache's application for injunctive relief and consolidated the hearing with a trial on the merits. (Dkt. 22.) On April 17, 2008, the Honorable

Colleen McMahon stayed the parallel New York action. (*See* Civil Action 8-3458 (S.D.N.Y. April 17, 2008), Dkt. 17.)

## ANALYSIS

To resolve this dispute, the court must determine whether Apache properly excluded the Proposal from its proxy statement. Because the SEC found "some basis for [Apache's] view that [it] may exclude the proposal under rule 14a–8(i)(7)," the court must first determine whether it must defer to the SEC and adopt its position.[3]

There are two types of rules, substantive and interpretive. Substantive, or legislative-type, rules are those that create new law, rights, or duties, in what amounts to a legislative act. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 301-02, 99 S. Ct. 1705 (1979); *Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999). Substantive rules have the force of law. *See Batterton v. Francis*, 432 U.S. 416, 425 n.9, 97 S. Ct. 2399 (1977). Conversely, "interpretative rules are statements as to what [an] administrative officer thinks [a] statute or regulation means." *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979) (internal quotation marks omitted) (quoting *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952)). These rules do not have force of law, though

---

[3] A corporation seeking to exclude a shareholder proposal from its proxy materials must direct a no-action letter request to the chief counsel of the operating division responsible for administering the statute under which the request arises. *See* 17 C.F.R. § 240.14a–8(j)(1). Upon receipt, the request is reviewed by the division's chief counsel and assigned to a staff attorney for processing. Thomas P. Lemke, *The SEC No-Action Letter Process*, 42 BUS. LAW. 1019, 1027-28 (1987) ("Upon receipt of an assignment, the staff attorney will research the legal questions involved through publicly available research sources and internal Commission resources, such as summaries of recent interpretations and internal files on selected legal issues. If necessary to resolve a question, the staff will consult other sources such as legislative history and treatises on various statutory provisions.") After careful review, the attorney will draft a response and "submit it for review, along with a copy of the request and relevant research materials, to his immediate supervisor." *Id.* at 1028 ("In many cases the staff attorney will meet with his supervisor to discuss the recommended response. A proposed response that involves a novel or significant issue may be reviewed on several levels within the division or by the Commission itself before the response is issued.") If the division staff agrees that the proposal is excludable, it may issue a no-action letter, stating that, based on the facts presented by the corporation, the staff will not recommend that the SEC sue the corporation for violating Rule 14a–8. *See Procedures Utilized by the Division of Corporation Finance for Rendering Informal Advice*, 45 Fed. Reg. 72644, 72644 n.2 (Nov. 3, 1980). The no-action letter, however, is an informal response, and does not amount to an official statement of the SEC's views. *See* 17 C.F.R. § 202.1(d).

they are entitled to some deference from the courts. *Batterton*, 432 U.S. at 425 n.9. "Varying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position, and the nature of its expertise." *Id.* (citing *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 141-45, 97 S. Ct. 401 (1976); *Morton v. Ruiz*, 415 U.S. 199, 231-37, 94 S. Ct. 1055 (1974); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S. Ct. 161 (1944)); *see also United States v. Mead Corp.*, 533 U.S. 218, 228, 121 S. Ct. 2164 (2001).

The proper weight to accord an SEC no-action letter is an issue of first impression in the Fifth Circuit. The Second Circuit, however, noted that no-action letters are interpretive because they do not impose or fix a legal relationship upon any of the parties. *See Amalgamated Clothing & Textile Workers Union v. Sec. & Exch. Comm'n*, 15 F.3d 254, 257 (2d Cir. 1994). That court concluded that no-action letters are nonbinding, persuasive authority. *See id.* at 257 & n.3. This court agrees. Therefore, a court must independently analyze the merits of a dispute even when affirming the SEC's conclusion. *See, e.g.*, *New York City Employees' Ret. Sys. v. Brunswick Corp.*, 789 F. Supp. 144, 146 (S.D.N.Y. 1992).

Apache seeks to exclude the Proposal based on the Rule 14a–8(i)(7), 17 C.F.R. § 240.14a–8(i)(7), exception. Rule 14a–8 requires, under certain circumstances, a public company to include "a shareholder's proposal in its proxy statement and identify the proposal in its form of proxy when the company holds an annual or special meeting of shareholders." 17 C.F.R. § 240.14a–8. If the shareholder submits a proposal in accordance with controlling regulations, the company must include the proposal in its proxy materials unless it is properly excludable for the substantive reasons listed in Rule 14a–8(i). *See* 17 C.F.R. § 240.14a–8(i). Prior to excluding the proposal, Rule 14a–8(j) requires the company to "file its reasons with the Commission no later than 80 calendar days before

6

it files its definitive proxy statement and form of proxy with the Commission." 17 C.F.R. § 240.14a–8(j). The company must show that the proposal fits within one or more of Rule 14a–8(i)'s exceptions. *See Austin v. Consolidated Edison Co. of N.Y.*, 788 F. Supp. 192, 194 (S.D.N.Y. 1992); *Solicitation of Proxies*, 19 Fed. Reg. 246, 246 (Jan. 1, 1954) ("The rule places the burden of proof upon the management to show that a particular security holder's proposal is not a proper one for inclusion in management's proxy material.").

Rule 14a–8(i)(7) permits exclusion of a proposal if it "deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a–8(i)(7). The term "ordinary business operations" escapes formal definition. To gleam its scope, courts look to SEC guidance and state law.[4] In adopting Rule 14a–8(i)(7),[5] the SEC stated:

> the term "ordinary business operations" has been deemed on occasion to include certain matters which have significant policy, economic or other implications inherent in them. For instance, a proposal that a utility company not construct a proposed nuclear power plant has in the past been considered excludable . . . . In retrospect, however, it seems apparent that the economic and safety considerations attendant to nuclear power plants are of such magnitude that a determination whether to construct one is not an "ordinary" business matter. Accordingly, proposals of that nature, as well as others that have major implications, will in the future be considered beyond the realm of an issuer's ordinary business operations . . . .

*Adoption of Amendments Relating to Proposals by Security Holders ("1976 Release")*, 41 Fed. Reg. 52,994, 52,998 (December 3, 1976). Accordingly, only "business matters that are mundane in nature

---

[4] Additional authority for the meaning of "ordinary business operation" is provided by the law of the company's state of incorporation. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 128 S. Ct. 761, 770 (2008); *Med. Comm. for Human Rights v. Sec. & Exch. Comm'n*, 432 F.2d 659, 678 (D.C. Cir. 1970). However, Delaware law offers limited interpretive guidance. Delaware's General Corporation Law states that generally, "[t]he business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors." DEL. CODE ANN. tit. 8, § 141(a); *see also Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.*, 821 F. Supp. 877, 884 (S.D.N.Y. 1993) (Delaware corporation law on the issue of "ordinary business operations" has not developed beyond the Code).

[5] The current Rule 14a–8(i)(7) was previously designated 14a–8(c)(7).

7

and do not involve any substantial policy" considerations may be omitted under the "ordinary business" exception. *Id.*

> The policy underlying the ordinary business exclusion rests on two central considerations. The first relates to the subject matter of the proposal. Certain tasks are so fundamental to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight. Examples include the management of the workforce, such as the hiring, promotion, and termination of employees, decisions on production quality and quantity, and the retention of suppliers. However, proposals relating to such matters but focusing on sufficiently significant social policy issues (e.g., significant discrimination matters) generally would not be considered to be excludable, because the proposals would transcend the day-to-day business matters and raise policy issues so significant that it would be appropriate for a shareholder vote.
>
> The second consideration relates to the degree to which the proposal seeks to "micro-manage" the company by probing too deeply into matters of a complex nature upon which shareholders, as a group, would not be in a position to make an informed judgment. This consideration may come into play in a number of circumstances, such as where the proposal involves intricate detail, or seeks to impose specific time-frames or methods for implementing complex policies.

*Amendments to Rules on Shareholder Proposals ("1998 Release")*, 63 Fed. Reg. 29106, 29108 (May 28, 1998).[6] As to the second factor, the SEC explained that the determination "will be made on a case-by-case basis, taking into account factors such as the nature of the proposal and the circumstances of the company to which it is directed." *Id.* at 29109.

A clear reading of the *1998 Release* informs this court's analysis. To read the guidance as directing proper exclusion of shareholder proposals only when those proposals do not implicate a

---

[6] In 1992, the SEC issued a no-action letter to Cracker Barrel ruling that all employment-related stockholder proposals raising social policy issues would be excludable under the ordinary business exception. Cracker Barrel Old Country Stores, Inc., SEC No-Action Letter, 1997 WL 384740 (October 13, 1992). In the *1998 Release*, the SEC reversed its prior ruling:
> Reversal of the Cracker Barrel no-action position will result in a return to a case-by-case analytical approach. In making distinctions in this area, the [SEC] will continue to apply the applicable standard for determining when a proposal relates to "ordinary business." The standard, originally articulated in the [SEC]'s 1976 release, provided an exception for certain proposals that raise significant social policy issues.

*1998 Release*, 63 Fed. Reg. at 29108.

significant social policy would make much of the statement superfluous and most of the no-action letters presented to the court by the parties incorrect.[7] Because such a directive cannot be gleamed from the release language, the court finds that it must first determine whether the Proposal implicates a significant policy issue. A proposal that does not concern a significant policy issue but nevertheless implicates the ordinary business operations of a company is properly excludable under Rule 14a–8(i)(7). However, a proposal concerning the ordinary business operations of a company that implicates a significant policy issue is only excludable under Rule 14a–8(i)(7) if it "seeks to 'micro-manage' the company by probing too deeply into matters of a complex nature upon which shareholders, as a group, would not be in a position to make an informed judgment." *1998 Release*, 63 Fed. Reg. at 29108. As one court explained, "management cannot exercise its specialized talents effectively if corporate investors assert the power to dictate the minutiae of daily business decisions." *Med. Comm. for Human Rights*, 432 F.2d at 679, *vacated as moot*, 404 U.S. 403, 92 S. Ct. 577 (1972).

---

[7] Defendants argue that their Proposal implicates a significant social policy that transcends the ordinary business exception. Defendants urge that the *1998 Release* arose from the Commission's recognition of the significance of avoiding employment discrimination based on sexual orientation–the policy at issue in this case. Defendants, therefore, conclude that the Commission's reversal of the Cracker Barrel decision is, by itself, a fully sufficient basis for denying exclusion of the Proposal under Rule 14a–8(i)(7). Had the defendants drafted the Proposal to simply request that Apache add sexual orientation to its existing anti-discrimination policy and deleted the principles, the court would be inclined to agree with the defendants. But, the proposal goes well beyond that. Defendants further argue that any reliance on the SEC's no-action letter is misplaced. Because the letter "refuses" to analyze the significance of the underlying social policy, the finding of "some basis for [the] view that Apache may exclude the proposal under rule 14a–8(i)(7)" "'contravenes the *1976 Release*'s explicit recognition that all proposals could be seen as involving some aspect of day-to-day business operations.'" (Dkt. 19 (quoting *Wal-Mart Stores, Inc.*, 821 F. Supp. at 890)). Defendants argue that because the *Wal-Mart* court noted that all proposals could be viewed as effecting at least some aspect of ordinary business operations, whether a proposal implicates significant social policy is the dispositive inquiry.

Conversely, Apache contends that defendants' interpretation of Rule 14a–8(i)(7) would make the exception ineffectual. The court can posit circumstances where even under defendants' interpretation, Rule 14a–8(i)(7) would function to exclude proposals addressing ordinary business matters without significant social policy implications. Nevertheless, defendants' interpretation would promote submission of proposals dealing with ordinary business matters yet cabined in social policy concern. Although the proposal exclusion process would be significantly simplified, the court finds defendants' interpretation unwise. The SEC reversed Cracker Barrel because it found the hard and fast rule it promulgated failed to adhere to the guidance issued in the *1976 Release*. Defendants' interpretation of Rule 14a–8(i)(7) is inappropriate for the same reason.

The court now turns to the Proposal. The "resolved" paragraph provides, "The Shareholders request that management implement equal employment opportunity policies based on the aforementioned principles prohibiting discrimination based on sexual orientation and gender identity." Defendants now argue that the enumerated principles merely illustrate how various Fortune 500 corporations implemented non-discrimination policies. (Dkt. 26.) Nevertheless, a plain reading dictates the construction of the request. The shareholders seek that the company implement policies based on a list of principles. It is those principles that determine the employment opportunity policies, and not vice versa.[8] Specifically, Apache directs the court to the following principles:

> Principle (4) There shall be no discrimination in the allocation of employee benefits on the basis of sexual orientation or gender identity;
>
> Principle (7) Corporate advertising policy will avoid the use of negative stereotypes based on sexual orientation or gender identity;
>
> Principle (8) There shall be no discrimination in corporate advertising and marketing policy based on sexual orientation or gender identity;
>
> Principle (9) There shall be no discrimination in the sale of goods and services based on sexual orientation or gender identity; and,
>
> Principle (10) There shall be no policy barring on corporate charitable contributions to groups and organizations based on sexual orientation.

(Dkt. 6.) With these in mind, the Proposal seeks to have Apache implement policies incorporating sexual orientation and gender identity into the company's employee benefits allocation, corporate advertising and marketing activities, sales activities, and charitable contributions.

---

[8] Defendants argue that the enumerated principles are merely examples, not integral to the Proposal. But, the defendants sought to have the Proposal included in the proxy statement in its entirety. Therefore, because a plain reading of the Proposal indicates that the principles are indeed indispensable, and because the Proposal requests that the management of Apache "implement . . . policies based on the aforementioned principles . . . ," the court finds defendants' argument unconvincing and without merit. To permit revision of the proposal at this late stage would conflict with proposal submission regulations. *See* 17 C.F.R. § 240.14a–8(c), –8(e)(2).

10

Undoubtedly, advertising and marketing, sale of goods and services, and charitable contributions are ordinary business matters. Yet, the defendants, through the Proposal, seek to have Apache implement equal employment opportunity policies which incorporate anti-discrimination directives based on sexual orientation and gender identity into such activities. The court finds that only principles one through six are directed at discrimination in employment. To consider the remaining four principles as implicating employment discrimination would be a far stretch. Instead, principles seven through ten aim at discrimination in Apache's business conduct as it relates to advertising, marketing, sales, and charitable contributions. Therefore, because these principles do not implicate the social policy underlying the Proposal, and because the Proposal must be read with all of its parts, the Proposal is properly excludable under Rule 14a–8(i)(7).

Even were the court to find that principles seven through ten implicate the underlying social policy, the Proposal seeks to micromanage the company to an unacceptable degree. Shareholders, as a group, are not sufficiently involved in the day-to-day operations of Apache's business to fully appreciate its complex nature. For example, shareholders, as a group, are not positioned to make informed judgments as to the propriety of certain sales and purchases. Similarly, the complex implications stemming from the proposed principle forbidding discrimination in the sale of goods and services based on sexual orientation or gender identity preclude provident judgment on the part of the shareholders. It would be imprudent to effectively cede control over such day-to-day decisions, traditionally within the purview of a company's executives and officers, to the shareholders. The aforementioned concerns are enhanced by the principle's implicit requirement that Apache determine whether its customers and suppliers discriminate on the basis of sexual

orientation or gender identity. Such an inquiry is impractical and unreasonable, and the determination as to its propriety should properly remain with the company's management.

CONCLUSION

For the foregoing reasons, the court finds that pursuant to Rule 14a–8(i)(7), Apache properly excluded the Proposal from the proxy statement mailed to its shareholders. Further, the parties are

ORDERED to submit to the court briefs outlining their respective positions on the award of attorneys' fees. Apache must submit their brief no later than May 2, 2008. Defendants must submit their response no later than May 9, 2008.

Signed at Houston, Texas on April 22, 2008.

_____
Gray H. Miller
United States District Judge